IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

Ashley Marie Wahlert,

          Plaintiff,

      vs.

Commissioner of Social Security
Administration,

         Defendant.

CASE NO. 5:22-cv-01324-SL

DISTRICT JUDGE
Sara Lioi

MAGISTRATE JUDGE
James E. Grimes Jr.

**REPORT &
RECOMMENDATION**

Plaintiff Ashley Marie Wahlert filed a complaint against the Commissioner of Social Security seeking judicial review of its decision denying disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend the District Court affirm the Commissioner's decision.

## Procedural background

*Previous application.* Wahlert previously filed an application for disability insurance benefits[1] in November 2017 alleging a disability onset

---

[1]    Wahlert also sought supplemental security income in her first application, however, her second application is limited to disability insurance benefits only. I have limited my discussion accordingly.

date of July 25, 2017.[2] Tr. 122. In June 2018, ALJ Gregory M. Beatty held a hearing at which Wahlert and a vocational expert testified. *Id*. On September 25, 2019, ALJ Beatty issued his decision finding that Wahlert was not disabled. Tr. 119–33.

*Present application.* In July 2020, Wahlert filed the present application for disability insurance benefits, Tr. 248–54, alleging a disability onset date of September 26, 2019,[3] and claiming that she is disabled due to multiple sclerosis (MS), fractured vertebrae, asthma, cognitive decline, heart palpitations, anxiety, anemia, and vision problems. Tr. 257, 282. The Commissioner denied Wahlert's application at the initial level and upon reconsideration. Tr. 145–51, 152–59. In May 2021, ALJ Susan Smoot held a hearing at which Wahlert and a vocational expert testified. Tr. 85–118. In July 2021, ALJ Smoot issued a written decision finding that Wahlert was not disabled. Tr. 65–80. ALJ Smoot's decision became final in June 2022, when the Appeals Council declined further review. Tr. 1–6; *see* 20 C.F.R. § 404.981. Wahlert filed this action in July 2022. Doc. 1. She asserts the following assignments of error:

---

[2]    "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm's of Soc. Sec.*, 193 F. App'x 422,425 (6th Cir. 2006).

[3]    Wahlert initially alleged a disability onset date of July 25, 2017, in her second application, just as she had in her first. Tr. 278. She later amended the alleged onset date to July 26, 2019, one day after her first application was denied, thus creating a separate period for consideration. Tr. 99.

1. The ALJ erred when she incorrectly applied the doctrine of res judicata and failed to provide Wahlert's new application a fresh look.

2. The ALJ erred at Step Three of the Sequential Evaluation when she failed to properly evaluate Wahlert's Multiple Sclerosis pursuant to Listing 11.09.

3. The ALJ committed harmful error when she failed to properly apply the criteria of Social Security Ruling 16-3p and found that the effect of the combination of Wahlert's symptom[s] allowed her to engage in substantial gainful activity on a full-time and sustained basis.

Doc. 6, at 1.

## Factual background

1. *Personal and vocational evidence*

Wahlert was born in November 1986 and was 32 years old on the amended alleged disability onset date. Tr. 78, 99, 278. She has a high school education. Tr. 283. She used to work as a server in a restaurant and currently works three to six hours per week a medical biller for a pediatric clinic. Tr. 100, 101. Wahlert previously worked full-time for the clinic but steadily reduced her hours over the past ten years. Tr. 100–01, 283.

2. *Medical evidence.*[4]

Wahlert was diagnosed with MS in 2014. Tr. 535. She received her first intravenous infusion of the "disease modifying medication Ocrelizumab

---

[4]     This recitation of medical evidence is not intended to be exhaustive and is limited to the facts provided in the parties' briefs.

(Ocrevus)" in September 2017. *Id*. Wahlert has been treated at the Oak Clinic for Multiple Sclerosis since March 2018. *Id*. Her treatment plan includes biannual visits with a neurologist or other member of her Oak Clinic care team, staggered biannual infusions of Ocrevus as a preventative, and appointments as needed to address flare-ups and other MS symptoms. Tr. 418, 422, 426, 535, 542, 582.

In August 2019, Wahlert sought emergency medical treatment for pain and discomfort in her knee which had persisted for two weeks. Tr. 402. Wahlert indicated that she had been sitting at home with her 57-pound dog on her knee when the dog leapt up and ran away, causing Wahlert's left knee to buckle. *Id*.

In September 2019, Wahlert established care with physician Diana Brewster, DO. Tr. 480. Wahlert complained of anemia, fatigue, and difficulty falling asleep. *Id*. She informed Dr. Brewster that the type of MS she has is relapsing, remitting, and that her most recent relapse had been four months earlier in May 2019. *Id*. Dr. Brewster conducted a physical examination and found that the range of motion in Wahlert's neck was normal, as was her breathing, heart rate, and heart rhythm. Tr. 482. Dr. Brewster found that Wahlert was alert and oriented with an appropriate affect and demeanor. *Id*.

In October 2019, Wahlert saw Dr. Brewster twice. Tr. 484–88, 489–53. During her first visit, Wahlert complained of stomach pain with nausea, vomiting, and a cough. Tr. 484. During her second, she complained of continued abdominal pain, aggravated by greasy or fatty foods, as well as fatigue. Tr. 489.

4

In November 2019, Wahlert saw nurse practioner Lauren Junk at the Oak Clinic. Tr. 422–25. Wahlert said that she had been doing "well for the last six months" although she reported intermittent blurred vision, mainly in her left eye, which occurred during times of stress or when she was fatigued. Tr. 422. Her blurred vision "resolv[ed] with rest." Tr. 422. Wahlert described experiencing nocturnal muscle spasms and daily fatigue. *Id*. Junk found that Wahlert's gait, strength, station,[5] coordination, and speech were normal. Tr. 423. She noted that Wahlert's reflexes were normal except for potential patellar hyperreflexia.[6] *Id*. Junk discussed the dosage, effectiveness, and side effects of Wahlert's medications, including her preventative infusions of Ocrevus. Tr. 424. Junk increased Wahlert's dosage of tizanidine to try to alleviate her nighttime spasms. *Id*.

In February 2020, Wahlert received her Ocrevus infusion and, a few days later, sought emergency medical treatment for nausea, heart palpitations, and a rapid heartbeat. Tr. 382. Wahlert complained of feeling shaky and said it was "almost as if things [were] vibrating." *Id*. She indicated

---

[5]    Station refers to one's manner of standing. *Station*, Merriam-Webster online dictionary, (last visited May 12, 2023), https://www.merriam-webster.com/dictionary/station.

[6]    "Hyperreflexia refers to hyperactive or repeating (clonic) reflexes." H. Kenneth Walker, *Chapter 72: Deep Tendon Reflexes*, Clinical Methods: The History, Physical, and Laboratory Examinations (3d ed. 1990), *available at* https://www.ncbi.nlm.nih.gov/books/NBK396/, (last visited May 12, 2023), "These usually indicate an interruption of corticospinal and other descending pathways that influence the reflex arc due to a suprasegmental lesion, that is, a lesion above the level of the spinal reflex pathways." *Id*.

that she had never experienced such side effects from her infusions before. *Id*. X-rays of Wahlert's chest were normal. *Id*. The cause of her symptoms was not determined. *Id*.

In May 2020, Wahlert had a telehealth appointment with neurologist Christopher Sheppard, MD, at the Oak Clinic. Tr. 418–21. Wahlert reported that she was doing "fairly well" "overall," saying that although she was not sleeping well, this was "likely" due to the stress of being "at home … with her kids" who were not able to "leav[e] the house much because of the … pandemic." Tr. 419. During the appointment, Wahlert denied having any loss of vision or double vision, facial weakness or numbness, or significant change in the functioning of her arms or legs inasmuch as her strength, sensation, balance, or gait were concerned. *Id*. Dr. Sheppard remarked that he was unable to conduct a detailed neurological examination, but found Wahlert's cortical functions were "awake, alert, oriented, cooperative" and her speech, use of language, stance, and gait were normal. Tr. 419–20. He found that Wahlert's facial movements were normal and symmetrical, her extraocular movements were intact, and the motor strength in her arms and legs was normal and bilateral. Tr. 419. Wahlert had stopped taking Clonazepam and noticed an increase in spasticity and neuropathic pain at night, so Dr. Sheppard put her back on Clonazepam. Tr. 420.

In July 2020, Wahlert saw Dr. Brewster and reported episodes every few weeks during which she felt her heart palpitate, became overheated, became

nauseated, started to sweat, and felt dizzy. Tr. 508. Wahlert said that she had gone to the emergency room to address these episodes and underwent "a bunch of tests," but all of the results came back normal. *Id*. Wahlert reported having suffered from insomnia for six years, estimating that she gets four hours of sleep per night. *Id*. Dr. Brewster diagnosed Wahlert with generalized anxiety disorder without "true panic attacks," prescribed Celexa, and recommended that Wahlert keep a log of her symptoms. Tr. 510–11.

In September 2020, Wahlert began to experience an increased intensity in her MS symptoms. Tr. 542. Dr. Sheppard would later characterize this as the start of a relapse. Tr. 537, 542. Wahlert called the Oak Clinic and left a message indicating that she had woken up in the early morning hours with an electric shock-like radiating down her spine to her legs. Tr. 542. She described a "burning" and "sharp" pain that happened when she lay flat, when she flexed her neck, and when she moved her head. *Id*. Oak Clinic Nurse Patricia Blake returned the call and advised Wahlert that she was likely experiencing Lhermitte's phenomenon.[7] *Id*. Wahlert reported that she had taken a non-steroidal anti-inflammatory which had reduced the sharpness of her pain but had not alleviated it completely. *Id*. Wahlert denied any change in her "usual

---

[7]     Lhermitte's phenomenon (or sign) describes an electric shock sensation that some people with MS experience if they make certain neck movements, particularly bending the neck forward. *Multiple Sclerosis*, Mayo Clinic Diseases & Health Conditions, (last visited May 12, 2023), https://www.mayoclinic.org/diseases-conditions/multiple-sclerosis/symptoms-causes/syc-20350269.

symptoms" of muscle cramps and intermittent blurred vision. *Id*. Blake suggested bedrest and arranged for Wahlert to receive a follow-up call in a week. *Id*.

It's not clear whether anyone from the Oak Clinic followed up with Wahlert, but Wahlert did not receive treatment for her MS again until December 2020, when she had a telehealth visit with Dr. Sheppard. Tr. 535–38. Wahlert reported having "very significant pain in her neck and legs that … worse[ned] with movement and improved with rest" for the past few months, and indicated that she still having the electric shocks from Lhermitte's phenomenon. Tr. 535. Wahlert mentioned "recent sensory symptoms, memory and cognitive concerns." *Id*. Wahlert said that her left leg "remain[ed] weak" but denied any change in her functioning. Tr. 535–36. Wahlert reported difficulty with her balance and gait but again denied those having worsened at all. Tr. 536. She told Dr. Sheppard that she felt unsteady when she walked and tended to drift to the left. *Id*. Wahlert reported an increase in her vision symptoms and said that she was experiencing weakness and numbness in her left arm and hand. *Id*. Wahlert's sleep improved when she took Clonazepam at night, and despite her vision issues, she could look at her computer for one to two hours at a time. *Id*. Wahlert was taking all of her regular medications— Clonazepam, Baclofen, and Gabapentin—as directed, and had gotten her muscle spasms under control. Tr. 537. She denied experiencing side effects from the Ocrevus infusions, which she had every six months as directed. *Id*.

Dr. Sheppard found that Wahlert's symptoms were consistent with a "spinal cord relapse of MS," noting that Wahlert's "significant change" had "c[o]me on relatively suddenly," even as he noted that she could not recall when her symptoms initially started to worsen. Tr. 537. Dr. Sheppard recommended that Wahlert address the relapse pharmaceutically—increasing the dosage of her Gabapentin and prescribing a course of oral steroids—and non-pharmaceutically—continuing her bedrest and ordering updated magnetic resonance imaging (MRI) of her brain and spinal cord so that he could monitor the progress of her MS. Tr. 537.

In January 2021, Wahlert received her infusion of Ocrevus at the Oak Clinic. Tr. 572. Wahlert's vital signs before and after her infusion were normal. Tr. 574.

Two weeks later, Wahlert had an appointment with Dr. Brewster seeking a COVID-19 test because she had aches, fatigue, headache, shortness of breath, stomach cramps, diarrhea, pain in her left eye, sinus pain and congestion, chills, and sweating. Tr. 565. Dr. Brewster confirmed that Wahlert was negative for COVID-19, diagnosed her with an upper respiratory infection, and prescribed antibiotics. Tr. 567.

In April 2021, Wahlert went to Mercy Hospital for the updated MRI of her brain and spine. Tr. 577–80. The MRI revealed white matter in Wahlert's brain that is consistent with a diagnosis of MS. Tr. 582. Her cervical spine MRI showed no intermedullary abnormalities and no new lesions. Tr. 578, 582.

9

Comparative review of the three scans of Wahlert's brain in the Oak Clinic records revealed that the images of Wahlert's brain were unchanged since 2017. *See* Tr. 582 (observing no change in Wahlert's May 2021 MRI as compared to the scan taken in June 2019, and no change in the June 2019 MRI as compared to the scan taken in 2017.). There were no new definite lesions, no significant canal or foraminal stenosis, and Wahlert's alignment was normal.[8] Tr. 578.

In May 2021, Wahlert met with nurse Carla Pham at the Oak Clinic. Tr. 582. Wahlert said that she didn't feel as if she was "back to her baseline" even though she had improved after the medication adjustments and other treatment. Tr. 582. Wahlert described having a right-side facial droop induced by stress, some double vision, some numbness in her face, stiffness and cramping in her wrists and hands, and said that she noticed that she sometimes "pulled to the left" when she walked. Tr. 583. "[One] of her biggest complaints" was "increased spasticity in her lower extremities" which made it hard for her to fall asleep and kept her awake at night. *Id*. Wahlert denied any change in the strength of, or sensation in, her arms or legs. *Id*. Pham conducted

---

[8]     The radiologist found Wahlert's alignment "anatomic." Tr. 578. Anatomic alignment of the spine refers to a normally aligned, vertically stacked upper cervical spine, lower cervical spine, lower thoracic spine and sacrum. *Importance of Posture and Spine Alignment and its Impact on High-Related Quality of Life*, Integrative Sports Medicine, https://www.integrativesportsmed.com/importance-of-posture-and-spine-alignment/#:~:text=In%20a%20normal%20(ideal%20spine,by%20more%20than%204%20cm, (last visited May 15, 2023).

10

a physical examination and found that Wahlert was "awake, alert, oriented, cooperative, tearful and emotional today." *Id*. Pham observed that Wahlert's speech, use of language, muscle tone, coordination, stance, gait, and motor strength were normal, except that Wahlert's right wrist was slightly weaker than her left. Tr. 583–84. Pham found Wahlert's extraocular movements intact, her pupils normal in their response to light, her facial movements normal and symmetrical, and her bicep, tricep, patellar, and achilles reflexes symmetrical. Tr. 583. Wahlert indicated that although the MRI scans did not reveal any changes, she was still having significant symptoms. Tr. 584. Nurse Pham informed Wahlert that even though new lesions might not appear on an MRI indicating her MS was progressing, Wahlert could still experience MS "symptoms that wax and wane." Tr. 584. Pham increased Wahlert's Gabapentin dosage and recommended physical therapy for her to work on strength and balance. *Id*.

3. *Function report*

In September 2020, Wahlert completed a function report. Tr. 301–08. This self-reported questionnaire asked Wahlert to explain how her impairments limited her ability to work. Tr. 301. Wahlert explained that a "spinal fracture [and] spasticity cause[d] her issues with walking" and ma[d]e it difficult for her to get comfortable when seated. Tr. 301. She also said that weak muscles in her eyes made her vision blurry and that numbness and pain

11

in her hands made typing and writing difficult. *Id*. The report asked Wahlert to describe what she did between waking up and going to bed. Tr. 302. Wahlert wrote:

> I wake up at 6 am and drive my kids to school. I eat sandwiches or leftovers for lunch. I work one or two days per week from home for a couple of hours … doing medical billing on my laptop. I pick my children up from school at 3pm and make sure they complete homework. My husband makes dinner and then I shower and go to bed by 8pm.

Tr. 302.

Wahlert said that her family has a dog, writing that, "to the extent that [she is] involved in taking care of him" she lets him out, gives him water, and feeds him. Tr. 302. The report asked Wahlert to describe her ability to handle personal care. Tr. 302. Wahlert said that she can dress herself "most days" but sometimes cannot pull a shirt over her head, can bathe herself "most days" but needs her husband's help to wash her hair, can shave normally, and, due to the standing and the heat, cannot cook. *Id*. The report asked Wahlert to describe her ability to complete house and yard work. Tr. 303. Wahlert said that although she can wash windows and match socks, those tasks take a her a long time to complete because she loses focus. *Id*. Wahlert indicated that she is able to shop in stores and online, spending a couple of hours once every couple of weeks to buy her kids clothes and food. Tr. 304. The report asked Wahlert to describe her hobbies and interests. Tr. 305. Wahlert responded that she watches "a lot of" television, watches movies, "used to" craft and paint, and reads when her eyes aren't bothering her. *Id*.

4.  *State agency and other medical opinion evidence*[9]

In October 2020, state agency consultative physician Gail Mutchler, MD, reviewed the medical evidence and adopted ALJ Beatty's conclusions from the previous decision, finding that Wahlert retained the residual functional capacity (RFC)[10] to:

> perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that she could frequently handle, finger, and feel items with her hands bilaterally; never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs, balance, stoop, kneel[], crouch, or crawl; and … must avoid all exposure to operating a motor vehicle.

Tr. 145, 150.

In February 2021, state agency consultative physician Scott Bolz, MD, affirmed Dr. Mutchler's findings. Tr. 152, 157–58.

---

[9]     When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[10]     An RFC is an "assessment of" a claimant's ability to work, taking his or his "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

In November 2020, state agency consultative psychologist Akanksha Dutt, Psy.D., conducted a review of the medical evidence but found that she had insufficient evidence to determine whether the prior ALJ's assessment could be adopted. Tr. 149. Dr. Dutt wrote that "in the absence of current evidence, it is not possible to ascertain the degree to which the claimant's alleged psychological symptoms impact her functioning. Thus, on account of insufficient evidence, this evaluation cannot be completed." *Id*.

In February 2021, upon reconsideration, state agency psychologist Jennifer Swain, Psy.D., explained that Wahlert had "failed to cooperate at the initial level, and thus, there was insufficient evidence to complete the mental assessment." Tr. 156. Dr. Swain adopted ALJ Beatty's RFC, indicating that she had reviewed ALJ Beatty's decision and Wahlert's subsequent medical evidence before finding that no new or material changes had developed since that time. Tr. 157. Dr. Swain endorsed ALJ Beatty's RFC and agreed that Wahlert had the RFC to:

> perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that she could frequently handle, finger, and feel items with her hands bilaterally; never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs, balance, stoop, kneel[], crouch, or crawl; and … must avoid all exposure to operating a motor vehicle.

*Id*.

5. *Testimonial evidence*

Wahlert and a vocational expert testified during the hearing held by ALJ Smoot in May 2021. Tr. 85–118. Wahlert was represented by attorney John Regas. Tr. 85. Wahlert testified that she has worked in medical billing and insurance for ten years, though she has steadily reduced the hours she is able to work for her employer each year. Tr. 100. She is only capable of working one day each week for three to six hours. *Id.* Wahlert can't work more because when she sits, she gets severe muscle spasms in her wrists, hands, and even her fingers. Tr. 102. She doesn't type correctly and has "a lot of obvious[] cognition problems." *Id.* Wahlert "just can't" answer the phone, deal with patients, or call insurance companies anymore. Tr. 102–03. She gets lost when she switches between two screens and "communicating is very difficult at this point." Tr. 103. She has poor memory and can't remember things if she hasn't written them down. Tr. 106. She doesn't do much of anything during the day, Tr. 104, has trouble sleeping, Tr. 106, and suffers from fatigue, Tr. 109–10. Wahlert's fatigue affects the muscles in her fingers, hands, and eyes. Tr 103, 109. She doesn't nap or need to sleep during the day. Tr. 109.

After Wahlert, vocational expert Thomas Nimberger testified. Tr. 110–17. The ALJ and Nimberger discussed Wahlert's work in medical billing. Tr. 111–12. Nimberger classified Wahlert's prior job as a server as semi-skilled work with a light level of exertion, Tr. 102, 112–13, and her work in medical billing as skilled, sedentary work. Tr. 111. Nimberger said that a hypothetical

15

individual with the same age, education, and work experience as Wahlert would not be able to perform Wahlert's past work if that hypothetical individual had the limitations assessed in Wahlert's RFC, described below. Tr. 114–15. Such an individual, however, could perform unskilled sedentary work such as a document preparer, addresser, and table worker. Tr. 79, 114–15.

Nimberger testified that the individual would be precluded from all work if he or she could only occasionally handle, finger, and feel with both arms. Tr. 116. Being off task for 20 percent of the workday or absent at a rate "equal to or greater than" two days per month would also eliminate all jobs. Tr. 117.

### The ALJ's decision

The ALJ made the following findings of fact and conclusions of law

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2024.

2. The claimant has not engaged in substantial gainful activity since September 26, 2019, the amended alleged onset date (20 CFR 404.1571 et seq.).

3. The claimant has the following severe impairments: relapsing remitting Multiple Sclerosis and obesity (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P,

16

Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except She can occasionally climb ramps and stairs, but can never climb ladders, ropes and scaffolds. She can occasionally balance, stoop, kneel, crouch and crawl. She can frequently handle, finger and feel with the bilateral upper extremities. She should avoid exposure to dangerous moving machinery and unprotected heights and should perform no commercial driving. She can perform simple routine tasks and make simple work-related decisions in a setting free of fast-paced production requirements or strict production quotas and with changed that are routine and predictable. She can have occasional interaction with the general public.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born [in] November … 1986 and was 30 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563).[11]

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has

---

[11] Wahlert was 32—not 30—years old on July 26, 2019, the amended alleged disability onset date. Tr. 99, 278. The miscalculation did not affect Wahlert's classification as a younger individual under the Social Security Act. Tr. 78, *see* 20 C.F.R. 404.1563.

transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 26, 2019, the amended alleged onset date, through the date of this decision (20 CFR 404.1520(g)).

Tr. 71–79.

## Standard for disability

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

> 1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.
>
> 2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.
>
> 3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration

> requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.
>
> 4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.
>
> 5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d

679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'" the Commissioner can act, without fear of court "'interference.'" *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

## Discussion

*Issue I: Challenging the ALJ's consideration of the previous RFC during the development of the present RFC*

Wahlert's previous application was denied by ALJ Beatty on September 25, 2019. Tr. 133. ALJ Beatty found that Wahlert had the capacity to:

> perform sedentary work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can frequently handle, finger, and feel items with her hands bilaterally; never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl; she must avoid all exposure unprotected heights or moving mechanical parts, and avoid concentrated exposure to operating a motor vehicle; can perform simple,

20

> routine and repetitive tasks, but not at a production-rate pace. She can make simple work-related decisions; occasionally interact with the public; and can tolerate changes in the workplace which are routine and predictable.

Tr. 127.

Wahlert filed the present application in July 2020. Tr. 248–54. In it, she alleged a disability onset date of September 26, 2019. Tr. 257. In June 2021, ALJ Smoot found that Wahlert was not disabled. Tr. 65–80. ALJ Smoot found that Wahlert had the capacity to:

> perform sedentary work as defined in 20 CFR 404.1567(a) except that she can occasionally climb ramps and stairs, but can never climb ladders, ropes and scaffolds. She can occasionally balance, stoop, kneel, crouch and crawl. She can frequently handle, finger and feel with the bilateral upper extremities. She should avoid exposure to dangerous moving machinery and unprotected heights and should perform no commercial driving. She can perform simple routine tasks and make simple work-related decisions in a setting free of fast-paced production requirements or strict production quotas and with changed that are routine and predictable. She can have occasional interaction with the general public.

Tr. 72–73.

In *Drummond v. Comm'r of Soc. Sec.*, an ALJ denied a claimant's initial application based on the determination that the claimant could not perform her past work but retained the residual functional capacity for sedentary work. 126 F.3d 837, 838 (6th Cir. 1997). After the claimant re-filed her disability claim, a second ALJ denied the application based on the determination that the claimant retained an RFC suitable for medium-level work. *Id*. at 839. On

21

review, the Sixth Circuit held that "the principles of *res judicata* can be applied against the Commissioner" and that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." 126 F.3d 837, 842 (6th Cir. 1997).

Following *Drummond*, the Social Security Administration adopted Acquiescence Ruling 98-4(6), 1998 WL 283902 (June 1, 1998). The Ruling provided that:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

1998 WL 283902, at *3.

In *Earley v. Comm'r of Soc. Sec.*, however, the Sixth Circuit explained that "[w]hen an individual seeks disability benefits for a distinct period of time, each application is entitled to review." 893 F.3d 929, 933 (6th Cir. 2018). It thus held that "*res judicata* only 'foreclose[s] successive litigation of the very same claim.'" *Id.* ("a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994."). *Earley* therefore establishes that a claimant's second application is entitled to review free of any presumption

that a previously determined RFC is correct. *See Nadjl v. Comm'r of Soc. Sec.*, No. 1:21-cv-01578-SL, 2022 WL 2820413, at *9–10 (N.D. Ohio July 8, 2022) (citations omitted).

In *Earley*, the Sixth Circuit also said that "it is fair for an administrative law judge to take the view that, absent new and additional evidence, the first administrative law judge's findings are a legitimate, *albeit not binding*, consideration in reviewing a second application." 893 F.3d at 933 (emphasis added). An ALJ may "consider a previous ALJ's RFC" determination and "errs only when he considers the previous RFC a mandatory starting point for the analysis." *Gale v. Comm'r of Soc. Sec.*, No. 1:18-cv-00859, 2019 WL 8016516, at *5 (W.D. Mich. Apr. 17, 2019).

Although not entirely clear, Wahlert seems to argue that the ALJ failed to give Wahlert's application the "fresh look" required by *Earley*. *See* Doc. 6, at 9–12. ALJ Smoot's decision, however, shows that despite her references to *Drummond*, she properly applied the *Earley* standard. She approached Wahlert's second application with a fresh look and primarily relied on evidence generated after the alleged disability onset date of September 26, 2019.

For starters, ALJ Smoot's RFC is more restrictive than ALJ Beatty's. *Compare* Tr. 72–73 (ALJ Smoot's RFC providing that Wahlert "should perform no commercial driving"), *with* Tr. 127 (ALJ Beatty's RFC providing that she "must … avoid concentrated exposure to operating a motor vehicle."). ALJ Smoot explained that "[b]ased on [Wahlert's] intermittent blurred vision,

23

reports of fatigue, and reports of reduced concentration due to MS," she had decided that "rather than avoiding concentrated exposure as found by the prior ALJ," Wahlert "should perform no commercial driving." Tr. 76, 77.

Moreover, Wahlert's argument disregards ALJ Smoot's statement that she was "generally but not completely" adopting the prior ALJ's RFC. Tr. 69. And ALJ Smoot's findings, as well as the supportive evidence she cited, differ in outcome as well as foundation from ALJ Beatty's findings. ALJ Smoot primarily relied on evidence generated after September 26, 2019, including Wahlert's updated treatment records, function report, and the testimony she provided during her second hearing. *See, e.g.*, Tr. 71–72 (citing 301–08, 96–110). ALJ Smoot noted Wahlert's self-reported ability to interact on social media for one to three hours per day, shop in stores and online, and engage with her large family and "great group of friends," even though Wahlert doesn't go out very often. Tr. 71 (citing Tr. 104, 105, 304).

ALJ Smoot also wrote that at the hearing, Wahlert indicated she was working three to six hours per week for her former employer handling medical billing and insurance follow-up. Tr. 72 (citing  Tr. 94, 100). She noted that Wahlert does "a lot" of reading, enjoys listening to music, assists her husband's children with their homework, handles her finances, pays bills, watches movies, makes crafts, and paints. Tr. 72 (citing 105, 302, 304, 305). Wahlert drives, takes children to school, cares for a dog, does the laundry, folds the laundry, and performs light cleaning duties around the house. Tr. 72 (citing

Tr. 104, 105). Wahlert was able to handwrite her eight-page Function Report and "maintain adequate focus to participate in the 56-minute long hearing." Tr. 72. ALJ Smoot noted that since the alleged disability onset date, Wahlert has experienced new symptoms, had a relapse, taken symptomatic medication, and reported intermittent MS symptoms in her eyes, hands, fingers, and neck. Tr. 73–75.

Review of ALJ Smoot's decision shows that in determining Wahlert's RFC, ALJ Smoot was guided by ALJ Beatty's findings but accounted for new evidence in accord with *Earley*. In doing so, she gave a "fresh look" to Wahlert's present application. ALJ Smoot added a restriction against commercial driving, explaining that she was doing so based on the finding that Wahlert had presented "new and material evidence." Tr. 69, 72–73, 76–77. Although ALJ Smoot agreed with ALJ Beatty in finding that Wahlert was not disabled, ALJ Smoot's determination was not, as Wahlert claims, merely an adoption ALJ Beatty's findings.[12] *See* Doc. 6, at 12. She proceeded as *Earley* instructed. While is true that ALJ Smoot cited *Drummond*, not *Earley*, in her decision, she was not required to cite any specific case as long as she adhered to the current principles, established in *Earley* when she evaluated Wahlert's impairments during subsequent application period. It's clear that she did. *See Petro v.*

---

[12]   Even if ALJ Smoot *had* fully adopted the previous ALJ's RFC determination, doing so could have been permissible, so long as ALJ Smoot took account of new evidence and gave the application a "fresh look." See *Black v. Comm'r of Soc. Sec.*, 1:20-cv-0183, 2021 WL 371730, at \*16 (N.D. Ohio Feb. 3, 2021) (citing *Earley*, 893 F.3d at 933).

*Comm'r of Soc. Sec. Admin.*, No. 1:20-CV-02838-PAG, 2022 WL 1813586, at *9 (N.D. Ohio Apr. 8, 2022), *report and recommendation adopted sub nom. Petro v. Comm'r of Soc. Sec.*, No. 1:20 CV 2838, 2022 WL 1804888 (N.D. Ohio June 2, 2022).

Also, ALJ Smoot evaluated the "new and material evidence" of Wahlert's intermittent hand and finger symptoms, as well as her relapse. Tr. 69. She credited Wahlert's claim that her MS had worsened during the end of 2020. *Id.* But ALJ Smoot additionally found that the improvement Wahlert experienced since then, due to medication and other treatment interventions, did not support finding that her symptoms were likely to remain at such an intensity for more than 12 months. *Id.*

Wahlert's remaining arguments are unpersuasive. Wahlert disregards the ALJ's decision when she argues that the ALJ should have—and, by inference, did not—consider evidence generated after September 26, 2019. Doc. 6, at 11.

Although ALJ Smoot erred when she mentioned *Drummond*, she cured any effect of that error when she, nonetheless, applied the correct standard and did not adhere to the previous RFC. Tr. 68–69.

*Issue II: Challenging the ALJ's evaluation of Listing 11.09 and the paragraph B criteria.*

Wahlert's heading for her second issue doesn't match the arguments that follow. Wahlert purports to challenge the ALJ's analysis of Listing 11.09 at step three. Doc. 6, at 12. She does not begin with a listing argument, though.

She discusses the requirements of Listing 11.09 briefly then copies two pages of facts verbatim from her Statement of the Facts section. *Compare* Doc. 6, at 13–14, *with id*. at 11–12. Then she argues, by inference, that the ALJ's consideration of Listing 11.09 is inadequate because its totality consists of the ALJ finding persuasive the prior administrative findings of the state agency consultants. *Id.* at 14. Then things get even murkier. Wahlert resurrects her *Drummond*-versus-*Earley* argument from issue one and claims that since the state agency consultants erroneously adopted the previous RFC findings— which they did, citing *Drummond*—and the ALJ found their opinions persuasive—which she did—the ALJ failed to properly consider Wahlert's intermittent symptoms under Listing 11.09. *Id.* at 14–15. Wahlert seems to connect the state agency consultants' failure to consider Wahlert's relapse in September 2020 with the ALJ's consideration, to argue that the ALJ did not properly address Wahlert's intermittent symptoms. *See Id.* at 15. It is only after this confounding start that Wahlert's listing argument begins in earnest. I have marshaled Wahlert's claims and included sub-head guideposts in the discussion for clarity.

The ALJ found that that Wahlert does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.09 or 11.09B. Wahlert claims that the ALJ's consideration of Listing 11.09 was inadequate for several reasons, arguing that: (1) the "totality" of the ALJ's

consideration was based on the flawed prior administrative findings of the state agency doctors; (2) the ALJ failed to properly consider Wahlert's relapse or intermittent MS symptoms, including fatigue; (3) the ALJ did not properly assess Wahlert's ability to physically function; and (4) the ALJ did not properly assess Wahlert's ability to concentrate, persist, or maintain pace under paragraph B. Doc. 6, at 12–17. Wahlert's arguments misread the ALJ's decision, misapply the law, and contradict the standard of review.

In Section 11, the listings provide guidance on the evaluation of neurological disorders, such as MS, that cause disorganization to one's motor function, bulbar and neuromuscular dysfunction, impair one's communication, or cause combined limitations to one's physical and mental functioning. 20 C.F.R. Part 404, Subpart P., App. 1, § 11. Listing 11.09 sets forth the requirements for impairment due to MS. 20 C.F.R. Part 404, Subpart P., App. 1, § 11.09. To meet or equal Listing 11.09, a claimant must have a diagnosis of MS that is characterized by either:

> (A) disorganization of motor function in two extremities, resulting in an extreme limitation in the ability to stand from a seated position, balance while standing or walking, or use the upper extremities; or
>
> (B) a marked limitation in physical functioning and a marked limitation in one[13] of the following "paragraph B" criteria:

---

[13]    As Wahlert correctly notes, a second way that a claimant can meet or medically equal the listing is if he or she has a marked limitation in physical function and a marked limitation in **one** of the paragraph B criteria, not **two** as the Commissioner asserted in her brief. *Compare* 20 C.F.R. Pt. 404, Subpart P., app. 1, § 11.09, *with* Doc. 7, at 10.

> (1) understanding, remembering, or applying information;
> (2) interacting with others;
> (3) concentrating, persisting, or maintaining pace; or
> (4) adapting or managing oneself.

*Id*. In order to meet or equal a "marked limitation" in the context of a neurological disorder, one's:

> … neurological disorder must result in a marked limitation in physical functioning and a marked limitation in one of the four areas of mental functioning (see 11.00G3). Although we do not require the use of such a scale, "marked" would be the fourth point on a five-point scale consisting of no limitation, mild limitation, moderate limitation, marked limitation, and extreme limitation. We consider the nature and overall degree of interference with [one's] functioning. …
>
> (a) … a marked limitation means that, due to the signs and symptoms of [one's] neurological disorder, [one is] seriously limited in the ability to independently initiate, sustain, and complete work-related physical activities (see 11.00G3). [One] may have a marked limitation in … physical functioning when [one's] neurological disease process causes persistent or intermittent symptoms that affect [one's] abilities to independently initiate, sustain, and complete work-related activities, such as standing, balancing, walking, using both upper extremities for fine and gross movements, or results in limitations in using one upper and one lower extremity. The persistent and intermittent symptoms must result in a serious limitation in [one's] ability to do a task or activity on a sustained basis. We do not define "marked" by a specific number of different physical activities or tasks that demonstrate [one's] ability, but by the overall effects of [one's] neurological symptoms on [one'] ability to perform such physical activities on a consistent and

29

> sustained basis. [One] need not be totally precluded
> from performing a function or activity to have a
> marked limitation, as long as the degree of
> limitation seriously limits [one's] ability to
> independently initiate, sustain, and complete work-
> related physical activities.

20 C.F.R. Part 404, Subpart P., App. 1, § 11.00(G)(2).

    *1. The effect of the prior administrative findings of the state agency consultants on the consideration of Listing 11.09.* Wahlert claims that the ALJ did not adequately consider Wahlert's intermittent MS symptoms or her relapse in September 2020 during her consideration of Listing 11.09. Doc. 6, at 14. She asserts that the "totality" of the ALJ's consideration of that listing consists of one sentence on page 72 of the transcript which was based on the flawed opinions of the state agency medical consultants. Doc. 6, at 14 (citing Tr. 72). Wahlert claims that since the state agency doctors did not consider Wahlert's September 2020 MS relapse when they developed their opinions, and the ALJ found persuasive their opinions, the ALJ did not properly consider her intermittent MS symptoms or relapse when she considered Listing 11.09. Doc. 6, at 14. This argument is belied by the ALJ's decision, in which the ALJ extensively considered the evidence. After finding that Wahlert does not meet or medically equal the requirements of any listed impairment, the ALJ said:

> No treating or examining physician has indicated
> findings that would satisfy the severity
> requirements of any listed impairment. In reaching
> the conclusion that the claimant does not have an
> impairment or combination of impairments that
> meet or medically equal a listed impairment, I also
> considered the opinions of State Agency medical

30

consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion.

Tr. 72. Then, the ALJ explained this finding, discussing Wahlert's MS and its effect in combination with her other impairments, for the next several pages. *See* Tr. 72–78. The ALJ discussed Wahlert's written and oral statements about her MS symptoms, Tr. 73; referred to Wahlert's relapsing and remitting MS as she noted that Wahlert endured four years of symptoms before her diagnosis, Tr. 74; and detailed—at length—Wahlert's treatment for MS at the Oak Clinic, Tr. 74–75. The ALJ acknowledged Wahlert's relapse, or period of worsening symptoms, in September 2020. Tr. 75. Then she explained her findings with respect to the medical opinions, prior administrative findings, and third-party statements about Wahlert's impairments, including her MS. Tr. 76–78. The ALJ's consideration of Listing 11.09 thus extended beyond the incomplete excerpt Wahlert claims to represent its "totality." Wahlert's argument thus ignores the rest of the ALJ's decision.

*2. The evaluation of Wahlert's relapse and intermittent MS symptoms, including fatigue.* As part of her listing argument, Wahlert next claims that the ALJ disregarded "the fact that [she] had relapsing and remitting MS" and challenges the ALJ's assessment of her intermittent symptoms and relapse. Doc. 6, at 15. Wahlert makes this claim but fails to demonstrate why it is so. Wahlert also misreads the ALJ's decision, which explicitly accounted for the relapsing, remitting nature of Wahlert's MS. For example, the ALJ found that

31

"there was a medical worsening due to a MS flare in September 2020." Tr. 69. The ALJ mentioned Wahlert having "good and bad days" and noted her testimony that even on her good days, her symptoms "improve but do not fully go away." Tr. 73. The ALJ referred to Wahlert's MS as a "relapsing and remitting" condition "with symptoms of fatigue, left eye vision issues, balance issues, neuropathic pain, and paresthesia. Tr. 74. She noted that Wahlert's "spinal cord relapse of MS" required the intervention of oral steroids, a new and different treatment, for Wahlert and her doctors to regain control of her symptoms. Tr. 75. The ALJ considered Wahlert's description of her symptoms during the relapse, including "pain from her neck to her legs when she flexed her neck forward[,]" and wrote that while "[b]ed rest helped," Wahlert's "symptoms recurred with activity." Tr. 74. The ALJ included Dr. Sheppard's note that Wahlert's condition had undergone a "sudden change" for the worse. Tr. 74. A plain reading of the ALJ's decision shows that she did not "disregard" the nature of Wahlert's intermittent MS symptoms.

Although the state agency doctors did not acknowledge Wahlert's September 2020 flare-up, ALJ Smoot did. At step two, ALJ Smoot found, in pertinent part, that Wahlert had the severe impairment of "relapsing, remitting Multiple Sclerosis." Tr. 74. The ALJ's inclusion of the full name of Wahlert's type of MS—relapsing, remitting—shows that she was aware of its intermittent nature and why that mattered. The ALJ cured the state agency doctors' mistaken adherence to the *Drummond* standard. The ALJ included a

32

discussion of Wahlert's worsening condition during her relapse, noted her improvement after medical intervention and treatment, and explained that she, nonetheless, still found that Wahlert did not meet or equal Listing 11.09 because the decline in her condition due to relapse was not likely to last longer than twelve months. Tr. 75.

Wahlert's challenge to the analysis of intermittent symptoms at step three continues with the claim that the ALJ erred in finding that Wahlert was not markedly limited in physical functioning under Listing 11.09 and failed to discuss "all" of Wahlert's intermittent MS symptoms, including fatigue, difficulties with balance, and "the use of her upper extremities." Doc. 6, at 15–16. Wahlert writes, "the record, as set forth above, established that [she] had symptoms which were exacerbated by stress and continu[ed] attempts to work." Doc. 6, at 15. "Above," in her legal argument section, Wahlert includes verbatim, lengthy portions of her facts section without analysis. Doc. 6, at 13–14. She fails to provide a foundation sufficient to support her argument in that she does not articulate which facts established which claims or connect any claim to any instance where the ALJ ignored something. Doc. 6, at 16. Wahlert claims, without citation, that "throughout her treatment" she established a constant complaint of fatigue. Doc. 6, at 15. She offers an uncited definition of "severe fatigue" seemingly unrelated to Listing 11.09. Doc. 6, at 15–16. Wahlert says—without any factual support—that the ALJ "failed to support her decision to not find any limitations related to Wahlert's fatigue." Doc. 6, at

16. Wahlert claims that the ALJ "ignored" her "symptoms and fatigue" which are "new evidence" "documenting [her] condition." Doc. 6. at 16.

Wahlert's argument that the ALJ ignored her "difficulty with balance," Doc. 6, at 16, is undeveloped and perfunctory, and thus, forfeited. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."). And the brief that Attorney Regas submitted to the Appeals Council on Wahlert's behalf in August 2021 didn't challenge the ALJ's treatment of Wahlert's fatigue, her ability to balance, or the use of her upper extremities. Tr. 349–51. So Wahlert's arguments about these issues, Doc. 6 at 16, are not preserved. *See Ramsey v. Comm'r of Soc. Sec.*, 973 F.3d 537, 545 (6th Cir. 2020); *Maloney v. Comm'r of Soc. Sec.*, 480 F. App'x 804, 810 (6th Cir. 2012) ("It is axiomatic that 'a court should not consider an argument that has not been raised in the agency proceeding that preceded the appeal.'") (citation omitted); *see also Fetting v. Kijakazi*, 62 F.4th 332, 338 (7th Cir. 2023).

Even putting that problem aside, the ALJ *did* address fatigue inasmuch as Wahlert described experiencing it, including vision issues and cramps in her hands and fingers. Tr. 103, 108, 109–10. Wahlert testified that her fatigue was "different than tiredness" and denied needing to sleep during the day or take naps. Tr. 109, 110. Wahlert said that her "eyes get fatigued, then the muscles

don't want to work properly, so they work against themselves. And … my fingers, my hands get fatigued[,] it's like [they are] working against [themselves]." Tr. 109. Tired eye muscles blur Wahlert's vision. Tr. 103. Her hands and fingers cramp when she is in a seated position. Tr. 102.

So, when ALJ Smoot discussed Wahlert's eye issues, vision problems, hand and finger cramps, strength, and ability—or lack thereof—to drive, Tr. 76–77, she is considering Wahlert's fatigue. The ALJ pointed out that Wahlert's vision improved with treatment and rest, though she experienced blurred vision when fatigued. Tr. 73. The ALJ detailed Wahlert's additional optical issues, such as seeing halos and black spots for a few hours, and the fact that her eyes impeded her vision when they "[went] in different directions" because the muscles were tired. *Id*.

But Wahlert doesn't explain how the ALJ erred and doesn't present any legal argument based on any specific upper extremity limitation or issue with her balance. And she doesn't discuss any facts. So Wahlert has forfeited this claim.

To the extent that Wahlert's argument is based on the issues in her wrists, hands and fingers, her argument that the ALJ ignored these issues is simply untrue. *See* Tr. 71 ("[s]he uses social media for 1–3 hours per day"), 72 (she "makes crafts, … paints … drives … takes children to school … cares for a dog, does laundry, folds the laundry, and performs light cleaning tasks…) 73 (There are 'really bad' muscle spasms that reduce dexterity in the hands.") The

ALJ discussed Wahlert's statements about her hands and fingers cramping when she drives, and her fingers and hands developing tics and cramps if she doesn't take frequent breaks when she is on the computer. *See* Tr. 108, 109. Partly in consideration of Wahlert's hand cramps when she drives, ALJ Smoot adjusted the RFC by adding a restriction against commercial driving. Tr. 73.

So the ALJ explicitly addressed Wahlert's unique symptoms of fatigue, which affects the muscles in her eyes, hands, and fingers. Tr. 73. She did not neglect to consider these symptoms during her step-three consideration of Listing 11.09. Wahlert may disagree with the ALJ's finding but disagreement does not "provide a basis for remand." *Steed v. Colvin*, No. 4:15cv01269, 2016 WL 4479485, at *10 (N.D. Ohio Aug. 25, 2016).

*3. Consideration of Wahlert's physical functioning.* Wahlert claims that the record shows that she "had a marked limitation in physical functioning in that she had difficulties with balance as well as the use of her upper extremities." Doc. 6, at 16. From this premise, and what she says is her marked limitation "in her ability to concentrate, persist[,] or maintain pace," she seems to argue that the ALJ erred by not finding that she met the Listing's paragraph B criteria. *Id.* The ALJ found that Wahlert was not markedly limited in the ability to physically function and supported her determination with substantial evidence. *See* Tr. 74–75. The ALJ cited the transcript at pages 583 and 584, which includes May 2021 records of a physical examination during which Wahlert denied having any falls and in which her doctor noted that her

ambulation, speech, cranial nerves, coordination, gait, and strength were normal, except that the strength in her left wrist was slightly weaker than her right. The ALJ also cited page 423, which includes November 2019 neurology records of a physical examination during which (1) Wahlert reported improving over the previous six months; (2) Wahlert's doctor found Wahlert's gait, reflexes, strength, coordination, and speech normal; and (3) Wahlert and her doctor discussed how rest improved Wahlert's blurred vision symptoms. So the record supports the ALJ's finding that Wahlert does not have a marked limitation in her physical functioning.

*4. Consideration of Wahlert's ability to concentrate, persist, or maintain pace.* As a preliminary matter, once the ALJ made the properly-grounded determination that Wahlert was not markedly limited in the ability to physically function, an initial requirement of Listing 11.09B, Wahlert's remaining argument—challenging the ALJ's paragraph B assessment—is moot. But even if the Court were to address the merits, Wahlert cannot prevail on this claim.

Certain listings, such as 11.09, have a mental functioning component under a second section, "paragraph B," that provides criteria for evaluating mental functioning in four broad areas. ALJ Smoot found that Wahlert had a mild limitation in all four of the "paragraph B" areas. Tr. 71–72.

Wahlert claims that she is "seriously limited (ha[s] a marked limitation) in the ability to concentrate, persist, or maintain pace" but doesn't say what

37

this has to do with her argument. Doc. 6, at 16. To the extent that Wahlert's comment amounts to an argument, it is undeveloped, insufficient, and at odds with the standard of review. So her argument is forfeited. And, in any event, because substantial evidence supports the ALJ's decision, it doesn't matter whether the evidence could also support Wahlert's argument. *Jones*, 336 F.3d at 477; *see* 42 U.S.C. § 405(g) (the Commissioner's "findings … as to any fact if supported by substantial evidence shall be conclusive"). To the extent that Wahlert argues that substantial evidence does not support the ALJ's finding that she is mildly, not markedly, limited in the ability to concentrate, persist, and maintain pace, Wahlert's argument also fails.

The ALJ cited many of the facts in the record that support her finding, beginning with the daily activities in which Wahlert is able to engage. Tr. 72. For example, the ALJ noted that Wahlert spends three to six hours per week working in medical billing and insurance, which is skilled work with a specific vocational preparation (SVP) level of 5.[14] Tr. 72. She noted that Wahlert does "a lot" of reading, enjoys listening to music, assist with homework, handles financial accounts, pays bills, watches movies, makes crafts, and paints. *Id.*

---

[14]    The Dictionary of Occupational Terms lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT. *Pol'y Interpretation Ruling : Titles II & Xvi: Use of Vocational Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions*, SSR 00-4P, 2000 WL 1898704, at *1 (Dec. 4, 2000). See also *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 603 (6th Cir. 2009) (quoting 20 C.F.R. § 416.969).

(citing Tr. 105, 302, 304, 305). The ALJ also highlighted parts of the benefit application and hearing process that implicated Wahlert's capabilities in this area, such as her completion of multiple pages of handwritten Documents and engagement in the nearly hour-long hearing. Tr. 72. The ALJ referenced the observations of psychological consultant Christopher Ward, Ph.D., whose findings the ALJ deemed not fully persuasive due to vagueness, Tr. 76 (citing Tr. 556–61), noting that Dr. Ward found Wahlert had "some difficulty" with attention and focus and "some difficulty" completing tasks designed to test her attention, though Dr. Ward failed to specify the degree to which he found her ability to concentrate, persist, or maintain pace limited. *Id.* Dr. Ward observed that Wahlert had the energy, persistence, and ability to maintain pace necessary to complete the psychological evaluation. *Id.* Based on this evidence, and more, the ALJ found Wahlert mildly limited and accounted for this limitation in the RFC by restricting Wahlert to simple work. Tr. 72–73. Thus, the ALJ's finding is supported by substantial evidence. Tr. 76–77. As such, the ALJ did not err in the evaluation of Listing 11.09 or paragraph B.

*Issue III: Challenging the application of SSR 16-3p and evaluation of subjective symptoms.*

Wahlert claims that the ALJ "failed to properly apply the criteria of Social Security Ruling 16-3p" when reviewing the intensity, persistence and limiting effects of Wahlert's subjective symptoms. Doc. 6, at 17; *see* Social Security Ruling 16-3p Titles II And XVI: Evaluation Of Symptoms In Disability Claims Social Security Ruling 16-3p Titles II And XVI: Evaluation Of

Symptoms In Disability Claims, 82 Fed. Reg. 49,462 (Oct. 25, 2017). Wahlert describes SSR 16-3p's criteria, then inserts, verbatim, the same set of facts she included at the outset of her argument in issue two. *Compare* Doc. 6 at 18–19, *with id*. at 11–14. This time, Wahlert adds several more pages of facts—verbatim, again—that originally appeared in the "Hearing Testimony" section of her brief. *Compare* Doc. 6 at 18–21, *with id*. at 4–7, 11–12. She also includes factual evidence not previously discussed.[15] Doc. 6, at 21.

Wahlert claims that the lengthy factual recitation supports her argument, writing, "[i]t is clear that the evidence in this matter established that Wahlert satisfied the criteria set forth in Ruling 16-3p," and that the ALJ failed to articulate a supportable rationale for finding Wahlert's statements not entirely consistent with the objective evidence. Doc. 6, at 23; *see also id*. at 22 ("The ALJ failed to note Wahlert's symptoms which were established by the medical evidence.").

To the extent  Wahlert has presented an argument about Ruling 16-3p, Wahlert is incorrect. Ruling 16-3p provides "a two-step process for evaluating

---

[15]    The initial order in the case states that, "[a]ny fact in the transcript not referred to in a party's Statement of Facts shall be deemed non-essential to the determination of the issues presented." Doc.  3, at 4. Wahlert did not set forth all the facts relevant to her argument in the "Statement of the Facts" section of her brief. Rather, the argument section of her brief contains evidence that she did not detail previously. *Compare*, *e.g.*, Doc. 6, at 5, *with id*. at 21. Wahlert's counsel has been warned about this practice before. *See, e.g., Garcia v. Comm'r of Soc. Sec.*, No. 1:22-cv-1044, 2023 WL 2333520, at *15 n.11 (N.D. Ohio Jan. 27, 2023), *report and recommendation adopted*, No. 1:22-cv-1044, 2023 WL 2330893 (N.D. Ohio Mar. 2, 2023).

an individual's symptoms." 82 Fed. Reg. at 49,463. At step one, the ALJ should "determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." *Id*. At step two, the ALJ should "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities for an adult or to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim." *Id*. at 49,464.

Here, the ALJ found that Wahlert satisfied step one. She found that Wahlert's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." Tr. 73. So the issue is about step two. Under step two, the ALJ should consider the objective medical evidence and other evidence, including an individual's statements, medical sources, and non-medical sources. 82 Fed. Reg. at 49,464–65. And when "evaluat[ing] the intensity, persistence, and limiting effects of an individual's symptoms," the ALJ should consider the factors in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). *Id*. at 49,465. These factors are: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than

41

medication, an individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms. *Id*. at 49,465–66.

According to Wahlert, the ALJ failed to address these criteria. Doc. 6, at 23. Wahlert has seemingly ignored the ALJ's decision, which belies her argument.

The ALJ recounted the two-step analysis required by Ruling 16-3p. Tr. 73. So she was plainly aware of Ruling 16-3p. And after stating the analysis, she discussed the factors in Ruling 16-3p, albeit without specifically stating each factor.[16] *See* Tr. 73–75. The ALJ acknowledged the written reports and testimony as the source of Wahlert's primary disability claim due to MS. She addressed Wahlert's symptoms, indicating that Wahlert has "good days and bad days" but even on good days, her symptoms do not fully go away. Tr. 73. She discussed Wahlert's reports of progressive cognitive decline, including her poor memory, periods of unfocused listening, and need to write things down in

---

[16]    Even if the ALJ failed to consider all the Ruling 16-3p factors, Wahlert's argument would still fail because "an ALJ is not required to analyze all seven factors." *Pettigrew v. Berryhill*, No. 1:17-cv-01118, 2018 WL 3104229, at *16 (N.D. Ohio June 4, 2018), *report and recommendation adopted*, 2018 WL 3093696 (N.D. Ohio June 22, 2018). Rather, it is sufficient that an ALJ "consider[s] the relevant evidence," *id*., which the ALJ did.

order to remember them. Tr. 73. The ALJ considered the "really bad" muscle spasms Wahlert experiences in her hands, indicating that they reduce dexterity and give her hand cramps when she drives. Tr. 73. The ALJ noted that Wahlert's neck does not move correctly and causes her severe pain when Wahlert attempts to look down, and that she has symptoms throughout her left hip down through her leg. Tr. 73 (citing Tr. 98–99). The ALJ noted Wahlert's vision, which, although improved following her diagnosis with MS, still gets worse when Wahlert is fatigued and causes her to see halos and black spots that last for a few hours. Tr. 73 (citing Tr. 103).

The ALJ considered the objective medical evidence. She discussed Wahlert's relationship with her Oak Clinic medical team, from whom Wahlert had been receiving treatment since 2018. Tr. 74. The ALJ detailed Wahlert's appointments from November 2019 through May 2021 at the Oak Clinic. Tr. 74–75. ALJ Smoot documented many of Wahlert's symptoms during those visits, including intermittent blurred vision, mainly in her left eye, during times of stress or when she is fatigued, the "shock down her spine" to her legs when she flexed her neck, muscle cramps, sensory symptoms, memory and cognitive concerns, and stiffness and cramping in her hands and fingers. Tr. 74–75. The ALJ discussed the many normal findings made by Wahlert's doctors during those visits including her gait, reflexes, strength, coordination, and speech in November 2019; her chest x-rays in February 2020; her gait and the findings of her neurological exam in May 2020; her intact speech and

cranial nerves in December 2020; her vital signs in January 2021; her spinal alignment in April 2021; and her speech, cranial nerves, coordination, gait, and strength in May 2021, except that her left wrist was slightly weaker than her right. Tr. 74–75. The ALJ discussed Wahlert's improvement with medications including Ocrevus and symptomatic medications like Gabapentin and oral steroids. *Id*. The ALJ noted that medication helps Wahlert sleep, eases her pain, an improves her nocturnal muscle spasms. Tr. 73–74.

"Overall," the ALJ wrote, "Wahlert's evidence does not support a finding of disabling limitations." Tr. 75. Although Wahlert experienced a relapse in late 2020, her condition improved after a course of steroids. *Id*. And while Wahlert is not "back to baseline," the ALJ considered that her strength, sensation, reflexes, and gait are good, and her speech is normal. *Id*. She mentioned that Wahlert has received ongoing preventative infusions of Ocrevus since 2017, tolerates them well, and can lessen her symptoms with medication to relax her muscles and help her sleep. *Id*. She noted that Wahlert's doctors have rarely had to adjust her treatment regimen, and that Wahlert has not needed hospitalization since her alleged onset date.

The ALJ considered that Wahlert can "drive, use the computer for work and pleasure, read, help with homework, and perform household chores based on her own testimony, and that part of her job in medical billing requires her to make phone calls." Tr. 75. ALJ Smoot wrote that "these activities

demonstrate cognition, speech, vision, and physical capacity consistent with the residual functional capacity provided." Tr. *Id*.

So the ALJ followed the requirements of Ruling 16-3p.

At bottom, Wahlert's argument amounts to an invitation to ignore the standard of review and re-weigh the evidence. This Court cannot accept that invitation. See *Jones*, 336 F.3d at 477.

## Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: May 15, 2023

/s/ James E. Grimes Jr.
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019)